SUMTER COCA-COLA BOTTLING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9079. Promulgated July 30, 1927.

1. The value of an exclusive right to bottle and sell Coca-Cola within certain territory ascertained for the purpose of determining gain or loss upon the sale of the business to which it appertained.

2. Under the circumstances herein, certain debts ascertained to be worthless within the taxable year, allowed as deductions from gross income.

*George E. H. Goodner, Esq.*, for the petitioner.
*L. L. Hight, Esq.*, for the respondent.

#### FINDINGS OF FACT.

The petitioner was incorporated in the year 1913 under the laws of South Carolina to take over the business of a partnership that was engaged in bottling and selling Coca-Cola in Sumter, S. C., and vicinity under a franchise or agreement. The capital stock of the petitioner was of the par value of $5,000 and all of it was issued in June, 1913, for the business and assets of the partnership, including the Coca-Cola franchise. This franchise, which had been granted to the partnership in 1904, gave it the exclusive right to bottle, label and sell Coca-Cola in Sumter, S. C., and certain territory adjacent thereto. The transfer of this franchise to the petitioner was approved and ratified by the Coca-Cola Bottling Co. of Atlanta, Ga., which owned and controlled the bottling rights of Coca-Cola in a number of States, including South Carolina, and it thereafter made shipments of Coca-Cola syrup to the petitioner. The petitioner could buy Coca-Cola syrup only from the Coca-Cola Bottling Co., and that company could sell only to recognized franchise holders.

Part of the territory covered by the petitioner's franchise was sublet so that it operated only in what was known as the Sumter Plant territory. The petitioner had a royalty interest in the subleased territory, which royalty interest was transferred to one J. K. Croswell in the year 1916.

The actual cash value of the franchise, or right to bottle and sell Coca-Cola in the Sumter Plant territory, at the time it was acquired by the petitioner was $23,622.

In August, 1918, the petitioner sold its inventories, machinery, equipment, supplies and its Coca-Cola franchise for $47,000, of which $25,000 was represented by five notes for $5,000 each. In computing the profits from this sale the respondent determined that the cost to the petitioner of the physical assets sold was $21,032.58, and that the cost of the Coca-Cola franchise was $15,000, or a total cost of $36,032.58. The respondent also determined that the five $5,000 notes received in part payment by the petitioner were worth their face value and that the petitioner had realized a profit of $11,467.42 on the sale.

After the sale of its inventories, machinery, equipment, supplies and franchise on August 12, 1918, the petitioner discontinued business except the collection of its outstanding accounts, which business was carried on through the remainder of the year. At the time of the sale of the assets the accounts outstanding amounted to about $1,200. Certain accounts were subsequently collected so that at December 31, 1918, the accounts uncollected amounted to $993.83. These accounts were considered worthless at that date and no further attempt was made to collect them, nor were they ever paid. No book entry was ever made charging them off as worthless because the petitioner at that time had ceased to keep books of account.

The petitioner filed an income and profits-tax return for the year 1918 as provided by law. On November 18, 1923, the respondent notified the petitioner by letter mailed that date that it was proposed to assess additional tax against the petitioner for the year 1918 in the amount of $17,205.75. The additional tax was assessed on or about February 1, 1924. The petitioner on or about March 1, 1924, filed a claim for abatement of the additional tax so assessed and for refund of $490.72, the amount of tax originally assessed and paid on the return. On March 10, 1925, the respondent mailed to the petitioner a letter notifying it that its claim for abatement and refund had been allowed for $11,859.48 and rejected for $5,836.99, the deficiency in tax therefore being $5,346.27. The respondent's letter of March 10, 1925, is the basis for this proceeding.

In computing the petitioner's net income for 1918 the respondent included therein the amount of $11,467.42, determined by him to have

been realized by the petitioner as profit from the sale of its assets in the year 1918, and refused to allow as a deduction from gross income the amount of $993 representing debts claimed by the petitioner to have been worthless on December 31, 1918.

OPINION.

MARQUETTE: The first question presented for determination by the record in this proceeding is the value of the Coca-Cola franchise at the time it was acquired by the petitioner. The petitioner and the respondent are in accord that the value of the franchise at that time is the proper basis for determination of gain or loss from the subsequent sale in 1918, but they do not agree as to what the value was, the petitioner contending that it was $23,622, and the respondent that it was $15,000. There appears to be no dispute as to the cost of the physical assets sold in 1918.

Charles V. Rainwater, secretary and treasurer of the Coca-Cola Bottling Co. of Atlanta, which controlled the bottling rights for Coca-Cola in a number of States, testified that he had been such secretary and treasurer since 1906 and had supervision of the making and approving of all contracts and subcontracts involving the right to bottle and sell Coca-Cola in the territory controlled by his company. He was familiar with the amount of Coca-Cola syrup consumed in each territory and the profits realized by the bottlers, and had bought and sold franchises on his own account and owned interests in various bottling plants. He stated that originally selling rights for Coca-Cola were given away in order to induce and stimulate the use of that product, but that by 1913 the franchises or rights to sell in certain territories, had become very valuable and that he considered a first line contract or state right had a value of $5 for each gallon of syrup consumed in the territory per year, and the subcontract, such as the one involved here, a value of $2 for each gallon of syrup consumed in the territory per year. The average consumption of syrup in the Sumter Plant territory during the years 1911, 1912, and 1913 was 11,811 gallons, and he considered the franchise right to that territory worth $23,622 when it was acquired by the petitioner in 1913. The testimony of Rainwater was not impeached or contradicted in any way and we are of the opinion that it establishes that the franchise in question had a value of $23,622 in June, 1913, and we so hold.

The next question is whether the petitioner, in computing its net income for 1918, is entitled to deduct the amount of $993, representing uncollected debts existing on December 31, 1918. The evidence shows that the petitioner had sold all of its assets in August, 1918, and remained in business only for the purpose of collecting its outstanding accounts. Some of these accounts were collected between

August and December, 1918, and on the latter date there remained the amount of $993 uncollected. These accounts the petitioner's officers considered worthless and no further effort was made to collect them, and they remained uncollected. No book entry was made charging these debts off for the reason that the petitioner had ceased to keep books. We are of the opinion that the debts were worthless and were so ascertained by the petitioner during the taxable year 1918, and that the deduction claimed should be allowed.

The petitioner also alleged in its petition that the respondent erred in holding that the five promissory notes of $5,000 each, received by the petitioner in part payment for the assets sold in 1918 were worth par. However, the evidence produced as to this issue is not sufficient to warrant us in disturbing the respondent's determination and the petitioner so concedes in its brief.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*

Considered by PHILLIPS, MILLIKEN, and VAN FOSSAN.